CLERKS OFFICE US DISTRICT COURT
AT CHARLOTTESVILLE, VA
FILED

May 21, 2026

LAURA A. AUSTIN, CLERK
BY: /s/ Kayla Lokey
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

MARNIE W.,                              )
      Plaintiff,                        )      Civil Action No. 3:25-cv-00027
                                        )
v.                                      )      REPORT & RECOMMENDATION
                                        )
FRANK BISIGNANO,                        )      By:    Joel C. Hoppe
Commissioner of Social Security,        )             United States Magistrate Judge
      Defendant.                        )

Plaintiff Marnie W. asks this Court to review the Commissioner of Social Security's final decision denying her claim for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–434. ECF No. 1. The case is before me by referral under 28 U.S.C. § 636(b)(1)(B). Having considered the administrative record ("R."), ECF No. 7, the parties' briefs, ECF Nos. 13, 15, and the applicable law, I find that substantial evidence does not support the denial of benefits. Accordingly, I respectfully recommend that the presiding District Judge reverse the Commissioner's final decision and remand Marnie's case under the fourth sentence of 42 U.S.C. § 405(g).

## I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only whether the ALJ applied the correct legal standards and whether substantial evidence in the existing record supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88

1

F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100

(1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is

"more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount

of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). *See Biestek v. Berryhill*, 587 U.S.

97, 102–03 (2019). Substantial-evidence review considers the entire record and not just the

evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951);

*Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, a court must affirm the

ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a

claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). However, "[a]

factual finding by the ALJ is not binding if it was reached by means of an improper standard or

misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

## II. The Legal Framework

A person is "disabled" within the meaning of the Social Security Act if he or she is

unable to engage in "any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §

423(d)(1)(A). Social Security ALJs follow a five-step process to determine if a claimant is

disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe

impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or

equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant

work based on his or her residual functional capacity; and, if not (5) whether he or she can

2

perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 404.1520(a)(4).

The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. "At step five, the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy,' considering the claimant's residual functional capacity, age, education, and work experience." *Mascio v. Colvin*, 780 F.3d 632, 635 (4th Cir. 2015) (quoting 20 C.F.R. §§ 416.920(a)(4)(v), 416.960(c)(2), 416.1429); *accord* 20 C.F.R. §§ 404.1520, 404.1560, 404.929. "If the Commissioner meets [this] burden, the ALJ finds the claimant not disabled and denies the application for benefits." *Mascio*, 780 F.3d at 635.

### III. Background

Marnie applied for DIB in May 2022. *See* R. 175–76. She alleged that she had been disabled since March 18, 2022, because of cervical and lumbar degenerative disc disease with chronic neck, back, and leg pain. *See* R. 218, 225. Marnie was 51 years old, or a "person closely approaching advanced age" under the regulations, on her alleged onset date. R. 57; *see* 20 C.F.R. § 404.1563(d). Medical experts under contract with Virginia Disability Determination Services ("DDS") found Marnie "not disabled" upon an initial review of her records in August 2022 and upon reconsideration review in April 2023. *See* R. 56, 64. On February 5, 2024, Marnie appeared with counsel and testified at a hearing before ALJ H. Munday. R. 41–49. A vocational expert ("VE") also testified. *See* R. 49–54.

ALJ Munday issued an unfavorable decision on March 6, 2024. R. 19–29. She found that Marnie's cervical/lumbar "degenerative disc disease with stenosis and radiculopathy" was her

only "severe" medically determinable impairment ("MDI") during the relevant time.[1] R. 20; *see*

R. 23–24. This impairment did not meet or equal the relevant listing. R. 21–22 (citing 20 C.F.R.

pt. 404, subpt. P, app. 1 § 1.16).

ALJ Munday then evaluated Marnie's residual functional capacity ("RFC") based on the

medical and other evidence in her record. *See* R. 23–26. She found that Marnie could sustain

> light work as defined in 20 CFR 404.1567(b)[2] with a sit/stand option every 30
> minutes if needed while remaining on tasks; occasional stooping, kneeling,
> crouching, and crawling and climbing ramps and stairs; no climbing
> ladders/ropes/scaffolds; occasional exposure to vibrations; and occasional exposure
> to hazardous conditions including unprotected heights and moving machinery.

R. 22. Next, the ALJ summarized some of Marnie's statements describing chronic neck and back

pain with functional limitations, R. 41–49, 531–32; all the relevant objective findings on physical

exams and diagnostic images, R. 316–18, 323–24, 338–47, 357–58, 463, 483–87, 500–05, 566–

68, 570–71; and the medical opinions identifying different physical limitations caused by

Marnie's severe cervical and lumbar DDD with chronic pain, R. 60–61, 70–71 (DDS

physicians), R. 488 (Erik Scott, M.D.); R. 406, 425, 468, 559–60 (Randolph Lanford, M.D.). *See*

R. 23–26. ALJ Munday concluded that the above RFC finding was "supported by findings

during diagnostic testing; findings during examinations; the relative stability of [Marnie's]

---

[1] ALJ Munday also found that Marnie had several "non-severe" impairments. R. 20–21. Marnie does not challenge those findings on appeal.

[2] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). "[T]he full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time." SSR 83-10, 1983 WL 31251, at *6 (Jan. 1, 1983); *see Neal v. Astrue*, Civ. No. JKS 09-2316, 2010 WL 1759582, at *2 (Apr. 29, 2010). ALJ Munday found that Marnie could meet these strength demands, but she added "a sit/stand option every 30 minutes if needed while remaining on tasks." R. 25; *see* R. 25–26 (citing R. 60, 70, 531–32, 566–68). A light RFC with a sit/stand option is consistent with "limited light exertion level" work, R. 25. *See Golini v. Astrue*, No. 2:10cv525, 2011 WL 4409223, at *6 (E.D. Va. Aug. 16, 2011), *adopted*, 2011 WL 4408789 (E.D. Va. Sept. 2011), *and aff'd*, 483 F. App'x 806 (4th Cir. 2012).

impairments with current treatment; and the medical evidence of record as a whole." R. 26; *see*
R. 24–25 (symptoms analysis).

At step four, ALJ Munday found that Marnie had past relevant work as a medical office
clerk (DOT 205.362-018), which is "sedentary as generally performed but light exertion as
actually performed." R. 27; *see* R. 50. Relying on the VE's testimony, she found that Marnie's
"limited light" RFC, R. 25, allowed her to do this job as actually and generally performed, R. 27
(citing R. 51–52). She also found that Marnie could adjust to other work offering a significant
number of jobs in the national economy given her RFC, age, education, and work experience.
*See* R. 27–28 (citing R. 50–52). Accordingly, ALJ Munday concluded that Marnie was not
disabled from March 18, 2022, through March 6, 2024. *See* R. 28–29.

IV. Discussion

Marnie's arguments on appeal challenge ALJ Munday's RFC findings that she could
occasionally lift/carry up to 20 pounds and stand/walk for about six hours during an eight-hour
workday despite her chronic neck and back pain. *See* Pl.'s Br. 1, 12–22. She argues that the ALJ
misapplied 20 C.F.R. § 404.1520c in rejecting medical opinions from doctors who identified
"significantly greater . . . restrictions" caused by Marnie's cervical and lumbar DDD. *Id.* at 12
(citing R. 26). She also agues that substantial evidence does not support the ALJ's conclusion
that Marnie's statements describing severe chronic pain were "not entirely consistent with the
medical evidence *and other evidence* in the record," R. 24 (emphasis added), because "the ALJ
never considered [certain] 'other evidence'" as the regulation requires, Pl.'s Br. 20 (citing 20
C.F.R. § 404.1529(c)). *See* Pl.'s Br. 20–22. In particular, ALJ Munday appears to have
overlooked Marnie's detailed, consistent statements describing her very limited activities of daily
living. *See id.* (citing R. 43–45, 47–48); 20 C.F.R. § 404.1529(c)(3)(i). Both arguments are

5

persuasive.

*A.*      *The Legal Framework*

RFC is the claimant's "maximum remaining ability to do sustained work activities in an

ordinary work setting" for eight hours a day, five days a week despite her medical impairments

and symptoms. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). It is a

holistic factual finding "made by the [ALJ] based on all the relevant evidence in the case

record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011) (per curiam),

including clinical findings, medical opinions, and the claimant's statements both to the agency

and to her own healthcare providers, 20 C.F.R. § 404.1545. *See Patterson v. Comm'r of Soc. Sec.*

*Admin.*, 846 F.3d 656, 659 (4th Cir. 2017) ("This RFC assessment is a holistic and fact-specific

evaluation."). The ALJ's actual RFC finding, 20 C.F.R. § 404.1520(e), *must* "include those

[functional] limitations that the ALJ considers credibly established" by relevant evidence in the

record, *Bryant v. Colvin*, No. 3:13cv349, 2014 WL 896983, at *1, *12 (E.D. Va. Mar. 6, 2014).

*See Monroe v. Colvin*, 826 F.3d 176, 179, 188 (4th Cir. 2016).

The ALJ has broad (but not unlimited) discretion to determine if an alleged functional

limitation is supported by or consistent with other relevant evidence. *See Hines*, 454 F.3d at 464–

66; *Perry v. Colvin*, No. 2:15cv1145, 2016 WL 1183155, at *5 (S.D. W. Va. Mar. 28, 2016)

(citing *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)). The ALJ's decision need only

include a "narrative discussion describing" how specific medical facts and non-medical evidence

"support[] each conclusion" in the RFC determination, SSR 96-8p, 1996 WL 374184, at *7, and

logically explaining why the ALJ rejected inconsistent or contradictory evidence, *Thomas v.*

*Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019). *See Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d

83, 106 (4th Cir. 2020); SSR 96-8p, 1996 WL 374184, at *7 ("The [ALJ] must also explain how

any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved."). The ALJ's RFC determination is supported by substantial evidence when she "applied the correct legal standards" and her decision as a whole "built an accurate and logical bridge from the evidence to her conclusion." *Shinaberry v. Saul*, 952 F.3d 113, 120, 123 (4th Cir. 2020) (cleaned up). An error on either front generally precludes meaningful judicial review. *See, e.g.*, *Patterson*, 846 F.3d at 662; *Monroe*, 826 F.3d at 190; *Oakes v. Kijakazi*, 70 F.4th 207, 212–13 (4th Cir. 2023).

Marnie challenges the ALJ's analysis of the medical opinions and Marnie's symptoms. *See* Pl.'s Br. 12–19 (medical opinions); *id.* at 20–22 (symptoms). Both kinds of evidence play a critical role in a proper RFC assessment. SSR 96-8p, 1996 WL 374184, at *2; *see, e.g.*, *Oakes*, 70 F.4th at 212–15 (medical opinions); *Hines*, 454 F.3d at 464–66 (symptoms).

### 1.    *Medical Opinions*

"A medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in meeting specific functional demands of work. *See* 20 C.F.R. § 404.1513(a)(2). ALJs "will consider" a source's medical opinions using five "persuasiveness" factors[3] and "will articulate" in their decisions "how persuasive [they] find" each source's opinions to be. *Id.* § 404.1520c(a)–(b). "Of these factors, supportability and consistency are the most important."[4]

---

[3] Specifically, "an ALJ must consider the following factors: (1) supportability; (2) consistency; (3) a physician's relationship with the claimant; (4) a physician's specialization; and (5) other factors, like a physician's familiarity with the evidentiary record or their understanding of the SSA's policies and evidentiary requirements." *Oakes*, 70 F.4th at 212 (citing 20 C.F.R. § 404.1520c(c)(1)–(5)).

[4] "Supportability is the degree to which a provider supports their opinion with relevant, objective medical evidence and explanation." *Oakes*, 70 F.4th at 212. "The more relevant the objective medical evidence and supporting explanation" the source provides, "the more persuasive the medical opinions . . . will be." 20 C.F.R. § 404.1520c(c)(1). "[C]onsistency is the degree to which a provider's opinion is consistent with the evidence [from] other medical and non-medical sources in the record." *Oakes*, 70 F.4th at 212. "The more consistent" the source's medical opinions are with other relevant evidence, "the more persuasive the

*Oakes*, 70 F.4th at 212; *see* 20 C.F.R. § 404.1520c(b)(2). "Therefore, [ALJs] will explain how [they] considered the supportability and consistency factors" for each source's medical opinions in articulating how persuasive they found those opinions to be. 20 C.F.R. § 404.1520c(b)(2). They "may, but are not required to, explain how [they] considered the [other] factors . . . , as appropriate, when [they] articulate how [they] consider medical opinions."[5] *Id.* Additionally, the ALJ's decision must build an accurate and "logical bridge between the evidence and the ALJ's conclusion that [a medical] opinion," *Oakes*, 70 F.4th at 214, is or is not "persuasive" evidence of the claimant's RFC, *see id.* at 212–13. *See Drumgold v. Comm'r of Soc. Sec.*, 144 F.4th 596, 606 (4th Cir. 2025).

  2.  *Symptoms*

  "Symptoms mean your own statements describing your physical or mental impairment." 20 C.F.R. § 404.1502(i). The regulations set out a two-step framework for ALJs to evaluate symptoms. *Lewis*, 858 F.3d at 865–66; 20 C.F.R. § 404.1529. "First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms." *Lewis*, 858 F.3d at 866. Second, assuming the claimant clears the first step, "the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit [her] ability," *id.*, to work on a regular and continuing basis,

---

medical opinion(s) . . . will be." 20 C.F.R. § 404.1520c(c)(2). "Supportability and consistency are distinct legal concepts under this regulation." *Daryl R. v. O'Malley*, No. 5:23cv59, 2024 WL 3649033, at *4 n.4 (W.D. Va. Aug. 5, 2024) (citing *Oakes*, 70 F.4th at 212; 20 C.F.R. § 404.1520c(b)(2)–(c)(2)). Thus, the ALJ "must adequately explain how she considered *both* factors in her persuasiveness determination." *Id.* (emphasis added).

[5] An exception applies if the ALJ "find[s] that two or more medical opinions . . . about the same issue are both equally well-supported and consistent with the record but are not exactly the same." 20 C.F.R. § 404.1520c(b)(3) (parenthetical citations omitted). In that case, ALJs also "will articulate how [they] considered the other most persuasive factors . . . for those medical opinions." *Id.* Otherwise, they are only required to explain how they considered the supportability and consistency factors. *Id.* § 404.1520c(b)(2).

*Mascio*, 780 F.3d at 639. "Your symptoms, including pain, *will be determined* to diminish your capacity" for work on such basis "to the extent that your alleged functional limitations and restrictions due to symptoms, such as pain, *can reasonably be accepted as consistent* with the objective medical evidence and other evidence" in the record. 20 C.F.R. § 404.1529(c)(4) (emphasis added). ALJs "will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective evidence does not substantiate your statements." *Id.* § 404.1529(c)(2). Thus, an ALJ who reasonably finds that the claimant's statements are not consistent with objective medical evidence must always give at least one other valid reason, supported by substantial evidence in the record, for rejecting those statements. *See Earles v. Berryhill*, No. 6:17cv3045, 2018 WL 6332532, at *10 (D.S.C. Nov. 19, 2018), *adopted*, 2018 WL 6330166 (D.S.C. Dec. 4, 2018).

"The second determination requires the ALJ to assess the credibility of the claimant's statements about symptoms and their functional effects." *Lewis*, 858 F.3d at 866. In doing so, the ALJ must consider all evidence in the record bearing on the claimant's allegations that she is disabled by pain or other symptoms. 20 C.F.R. § 404.1529(a), (c). This evidence may include information about the claimant's daily activities, the nature and results of her medical treatment, and doctors' recommendations. *See id.* § 404.1529(c)(3). The ALJ must give specific reasons, supported by "references to the evidence," for the weight assigned to the claimant's statements, *Edwards v. Colvin*, No. 4:13cv1, 2013 WL 5720337, at *6 (W.D. Va. Oct. 21, 2013) (citing SSR 96-7p, 1996 WL 374186, at *2, *4–5). SSR 16-3p, 2017 WL 5180304, at *10–11 (Oct. 25, 2017). Her articulated reasons for rejecting a claimant's symptoms need only be legally adequate and logically supported by an accurate characterization of the evidence she relied upon in

9

concluding that the claimant's complaints were not credible. *See Brown v. Comm'r Soc. Sec. Admin.*, 873 F.3d 251, 269–70 (4th Cir. 2017).

B.      *Summary of Relevant Evidence*

Marnie used to work as a medical-records clerk for the University of Virginia Physicians' Group. R. 219, 270, 391. She has a long history of cervical and lumbar DDD and stenosis with chronic neck and lower back pain. *See* R. 381, 463. Marnie's primary care physician, Randolf Lanford, M.D., prescribed Vicodin and Effexor beginning in the summer of 2021. *See* R. 382.

1.      *Treatment Notes*

In March 2022, Marnie's "pain worsened after lifting [her] grandchild." R. 460. A lumbar MRI showed "[m]ultilevel disc degeneration changes notable at L3-L4 and L4-L5 with interval progression" compared to earlier images. R. 318 (Mar. 24, 2022); *see* R. 323–24 (Sept. 2021). "L4-L5 [showed] moderate to severe bilateral facet degenerative changes associated with the right neural foraminal sound synovial cyst . . . caus[ing] severe right lateral recess and neuroforaminal stenosis." R. 318. A cervical MRI showed "C3-C4 and C4-C5 disc degenerative changes with interval progression causing at most mild to moderate spinal canal stenosis and right greater than left severe neuroforaminal stenosis at C4-C5." R. 315 (Mar. 2022). A prior fusion was evident at C5-C7. *See* R. 314.

On March 18, 2022, Marnie saw Dr. Lanford about her worsening neck and back pain. *See* R. 440–42. He gave her a Toradol injection, prescribed Depo Medrol, and referred her to pain management. *See* R. 442, 463, 468. Dr. Lanford noted that Marnie was "unable to sit or stand for extended periods." R. 463. On March 31, Dr. Lanford put Marnie on FMLA leave through at least April 8, 2022. R. 468–69; *see* R. 463 ("May need to be extended if no improvement."). He opined that Marnie could "never" sit, stand, walk, lift/carry, or push/pull

10

secondary to "severe spinal stenosis [in the] cervical & lumbar spine" with worsening neck and lower back pain that radiated into her extremities. R. 468. Dr. Lanford completed similar FMLA forms for Marnie on April 8 and April 13. *See* R. 424–25, 443–47, 460–61. On April 8, he extended her "continuous" leave of absence through April 21 because her "back/neck pain" with radicular symptoms, R. 443, had not improved after two Toradol injections and a Depo Medrol pack, R. 460. *See* R. 443–44, 460–61. On April 13, Marnie's pain still had "not improved despite multiple medications." R. 424 ("Medrol Dose pack, Toradol, Vicodin."). Dr. Lanford opined that she could not "sit for longer than 30 minutes at a time," *id.*, and she could "stand for only short periods," R. 425. He noted that Marnie was scheduled for an epidural steroid injection ("ESI") on April 19, 2022. *See* R. 425. The ESI "should allow [her] to return to work" and "help decrease nerve pain in legs & arms." *Id.*

On April 26, Marnie established care with Matthew Holland, M.D., at the National Spine & Pain Center. *See* R. 338–43. Marnie "describe[d] a long history of pain involving the axial low back." R. 338. In March 2022, she also began "to experience radicular pain into the legs." *Id.* "The back pain is constant but the radicular pain is intermittent. Provocative factors include lifting, prolonged sitting, and walking." *Id.* Marnie told Dr. Holland that "[h]er tolerance for walking, standing, and sitting is limited to about 15 minutes." *Id.*; *see also* R. 344, 500, 505, 511, 518, 524, 529 (later progress notes documenting the same). On exam, Dr. Holland noted positive facet loading tests bilaterally, negative straight leg-raise bilaterally, negative Waddell's test, intact ability to walk on heels and toes, and no clonus in either lower extremity. R. 339. Marnie also had full 5/5 strength throughout, intact sensation, normal reflexes, and normal gait, posture, and coordination. R. 339–40.

Dr. Holland diagnosed bilateral lumbar radiculopathy and lumbar spinal stenosis with

neurogenic claudication. *See* R. 341–42. Both were"[s]table chronic" conditions. R. 341. Dr. Holland explained that "NSAIDS, physical therapy, and activity modification are the mainstays of initial treatment." R. 341. In some cases, "more aggressive intervention may be warranted. Steroid injections may help to decrease inflammation around nerve roots. The type of surgical intervention is tailored to address the underlying pathology." *Id.* In Marnie's case, "MRI of the lumbar spine identifies pathology at L4-5 level consisting of a right-sided synovial cyst producing severe lateral recess and neuroforaminal stenosis." R. 342. Dr. Holland scheduled "an L4-5 interlaminar epidural steroid injection. If she sees improvement with this[,] it may be repeated as needed." *Id.* He also prescribed "topiramate at night for neuropathic pain and as a sleep aid." *Id.*

Marnie had her first lumbar ESI on April 29, 2022. R. 345–46. According to Dr. Holland, she was "not considered to be a candidate for surgical intervention at this point." R. 345. But, she also "ha[d] not experienced satisfactory relief from other treatment modalities such as anti-inflammatory medications, analgesic pain medications, physical therapy, and a home exercise program." *Id.*; *accord* R. 463 ("Toradol and Depo Medrol given with minimal relief. Also taking Aleve 2 pills twice daily, Vicodin PRN pain. Ice/heat and daily exercises at home."). Marnie's lumbar radicular "pain severely impacts [her] quality of life and functionality." R. 345. Dr. Holland told Marnie to follow up in one month to assess the efficacy of topiramate "as well as the injection performed today." R. 346.

On June 1, Dr. Lanford opined that Marnie was "unable to return to work indefinitely" and should "transition to long term disability." R. 406; *accord* R. 405 ("Patient likely with permanent disability."). The ESI provided "minimal pain relief." R. 417. She was still "unable to sit/stand for periods [and] needs to be able to lay down [or] change positions." *Id.*; *see also* R.

12

405–06, 418. Dr. Lanford advised Marnie to keep taking topiramate and Vicodin and to follow up with pain management. R. 405. She "may seek surgical intervention in the future." *Id.* Marnie saw Dr. Lanford about once every three months in 2022–2023. *See* R. 534–45. When she complained of neck or back symptoms, he gave her a Toradol injection, R. 537, 543, or adjusted her pain medications, R. 537, 544–45.

Marnie saw Dr. Holland again on June 22, 2022. *See* R. 500–04. She reported "partial relief" from the first ESI and wanted to repeat it. R. 503. Topiramate was "only somewhat" helpful. *Id.* Dr. Holland noted that Marnie also "describe[d] symptoms consistent with both cervical and lumbar facet arthropathy" at this visit. *Id.* They "discussed medial branch nerve blockade as well as radiofrequency ablation." *Id.* He explained that the block involves anesthetizing the nerves in the neck which can "be diagnostic for facet joint disease, but also therapeutic." *Id.* Ablation "uses radio frequency waves to heat up and damage a nerve that senses pain in the spine." *Id.* Marnie said that she wanted to consider both options and investigate "the potential out-of-pocket costs for these procedures." *Id.* Marnie had a second lumbar ESI on November 10, 2022. *See* R. 505–10. She was still "not considered" a candidate for surgery. R. 507. Dr. Holland prescribed a TENS unit and told Marnie to follow up in one month. R. 508. "If she does not see more significant or sustained improvement" after this ESI, "she may be offered a diagnostic lumbar medial branch nerve block." *Id.*

On March 25, 2023, Marnie saw Erik Scott, M.D., for a consultative physical exam. *See* R. 483–88. She told Dr. Scott that she was disabled because of spinal stenosis resulting in "neck pain, low back pain, left worse than right leg pain, . . . and arm pain." R. 483. Standing or sitting "for a long time" made her pain worse. *Id.* Changing positions and taking medications helped, but her "pain intensity" was still "4–5/10 on most days." *Id.*; *accord* R. 338, 344, 500, 505

(reporting 5/10 pain in April, June, and November 2022). Marnie's physical exam that day was normal except that she endorsed "tenderness of the cervical spine" and she could not "walk on [her] heels due to pain," R. 487. *See* R. 486–87 (normal findings). Otherwise, Dr. Scott observed 5/5 muscle strength throughout, full range of motion, "steady and symmetric gait," no palpable muscle spasms, negative Romberg sign, intact sensation, normal reflexes, and negative straight leg tests bilaterally. R. 486.

Marnie saw Dr. Holland again on May 3. *See* R. 511–17. Her physical exam that day was normal, including negative Hoffmann bilaterally, full 5/5 strength in the cervical spine and both upper extremities, intact sensation and reflexes in the lower extremities, and normal gait and coordination. R. 513–14. Marnie reported "several months of improvement" after the ESI in June 2022. R. 516. She wanted to repeat it because her symptoms had returned. *Id.* Dr. Holland also noted that Marnie's neck symptoms were "consistent with left upper cervical facet arthropathy." *Id.* "She indicate[d] that at this time her neck symptoms are intermittent enough that she would prefer to hold off on scheduling [a] medial branch nerve block." *Id.* Dr. Holland noted that they would schedule this procedure "[i]f her neck pain symptoms worsen." *Id.*

Marnie had a third lumbar ESI on May 23. *See* R. 520–22. She also reported neck pain and symptoms "consistent with right upper cervical facet arthropathy." R. 522. Dr. Holland scheduled a "right C2-3 and right C3-4 medial branch nerve block." *Id.* "If she experiences short-term relief, she may be a candidate for radiofrequency ablation." *Id.* Marnie had her first "medial branch block for diagnostic purposes" on June 27, 2023. R. 526–27. "She will follow-up tomorrow to evaluate the efficacy of this procedure. If it works well, she will be scheduled for confirmatory block and radiofrequency ablation." R. 527. On June 28, Marnie "estimate[d] about 80% relief and an increase in function" after yesterday's right-sided block. R. 531–32. She

14

wanted "to undergo the second medial branch block bilaterally." R. 532.

Later that summer, neurosurgeon Mark Shaffrey, M.D., ordered new imaging to evaluate Marnie's lumbar disc disease and chronic low-back pain. *See* R. 564–70. X-rays showed "[m]ild to moderate disc space narrowing at L3-L4 and L4-L5 with some anterolisthesis particularly [at] L4-L5" and "[s]ome facet thickening" in the lumbar spine. R. 567 (Sept. 5, 2023); *accord* R. 570 (Aug. 11, 2023) ("Mild disc height loss at L4-L5. Scattered mild facet arthropathy."). Marnie also had "mild increased thoracic kyphosis" and "[m]oderate to severe degenerative disc disease and retrolisthesis at C3-C4 and C4-C5" with "[s]light anterolisthesis at C2-C3 and C7-T1." R. 567. A "[p]revious anterior cervical fusion at C5-C7 with disc spacers" showed "[n]o significant abnormal movement." *Id.*

2.      *Medical Opinions*

Jack Hutchenson Jr., M.D., reviewed Marnie's medical records for DDS in August 2022. *See* R. 58–61. He opined that she could frequently lift/carry 10 pounds and occasionally lift/carry 20 pounds. R. 60. She could sit and stand/walk for "about 6 hours" each (with normal breaks) during an eight-hour workday. *Id.* Dr. Hutchenson chose these "limitations due to the DDD in her cervical and lumbar spine being [a] severe" medically determinable impairment. R. 61; *see* R. 58 ("The claimant's DDD in her lumbar and cervical spine . . . are severe. She is being given a light RFC.").

Dr. Scott identified greater limitations on Marnie's capacities for sitting, standing, walking, and lifting/carrying after he examined her in March 2023. R. 488. He opined that she can sit "for 30 minutes at a time and 4 hours total in an 8 hour workday." *Id.* She can stand "for 30 minutes at a time and 4 hours total in an 8 hour workday due to degenerative disc disease." *Id.* She can walk "for 1 hour at a time and 4 hours total in an 8 hour workday due to degenerative

disc disease." *Id.* She did not need an assistive device to walk or navigate uneven terrain. *See id.* Finally, Marnie can "lift and carry 5 pounds frequently and 2–5 pounds occasionally due to degenerative disc disease." *Id.*

Joseph Duckwall, M.D., reviewed Marnie's updated medical records for DDS in April 2023. *See* R. 66–72. Dr. Duckwall agreed with Dr. Hutchenson that Marnie was limited to a light RFC "due to cervical and lumbar spine DDD." R. 70.

That December, Dr. Lanford completed a physical RFC form assessing Marnie's limitations from cervical/lumbar disc disease with radiculopathy. *See* R. 559–60 (Dec. 15, 2023). "On most days," Marnie could stand/walk for "10–15 minutes" before she needs "15+ minutes" of rest. R. 559. She could stand/walk for "less than 2 hours" total during an eight-hour workday. *Id.* "On most days," Marnie could sit for "15–30 minutes" before she must "stand and move about" for "5–10 minutes." *Id.* She could sit for "less than 2 hours" total during an eight-hour workday. *Id.* Marnie could lift "up to 10 lbs" on most days. R. 560. Marnie has "4+ bad days per month during which [her] symptoms are increased and [she] would not be able to complete an 8 hour work shift." *Id.* Dr. Lanford's signature appears under the following preprinted statement: "I assess the above limitations based on first-hand knowledge of my patient's conditions, experience treating patients with similar conditions, and because they are medically reasonable in relation to the patient's conditions(s)." *Id.*

### 3.    *Marnie's Testimony*

Marnie applied for DIB in May 2022. R. 175–76. She alleged that she had been disabled since March 18, 2022, because of cervical and lumbar degenerative disc disease with chronic neck, back, and leg pain. *See* R. 218, 225. Marnie "had back & neck pain for many years, but it only recently became unbearable to sit at work or do the things that [she] enjoy[s]." R. 232. She

16

"mostly stay[s] home" now. R. 229. She "need[s] to be able to change positions frequently" or lie down and rest throughout the day. R. 225–26; *see, e.g.*, R. 273 (5/23/2023 pain journal entry "As per usual, I spent most of the day in bed, half sitting/laying, changing positions often."). Marnie "can do small tasks for short periods, then rest." R. 226; *see also* R. 273–74, 277. "Sometimes" she will "load [the] dishwasher or start a load of laundry, then take a break." R. 226; *see, e.g.*, R. 273 (5/21/2023 pain journal entry "Loaded the dishwasher and back to lay/sit in bed."); R. 484 ("Her typical daily activities consist of washing dishes."). This "takes less than 5 minutes" a day. R. 227. She does not vacuum or do yard work. *Id.* She drives for "short trips – no more than 30 min" total. R. 228. Marnie "can only lift about 10 pounds without pain." R. 230. She can walk for "about 4–5 min." before needing to rest for "10 minutes or so." *Id.* Sitting or standing "for more than a few minutes" at one time cause pain. R. 227.

Marnie described the same symptoms and functional limitations at the hearing in February 2024. *See* R. 42–49. She explained that she resigned from her job after she "used all of [her] FMLA" leave. *See* R. 43. Her neck and back pain were "just unbearable" at that point. R. 42. By February 2024, Marnie had tried "a variety of medications," "at home physical therapy" exercises, and multiple lumbar ESI. R. 43–44. She was also "seeing a neurosurgeon." R. 44. The ESI "helped the more acute pain" for "[p]robably a couple of weeks" at a time. R. 44–45. They "didn't really help" her "chronic, every day pain." R. 45. Marnie hadn't seen Dr. Holland "in a while[] because [she] can't afford" more tests and procedures. *See* R. 44. The first "test that he did [on June 27, 2023] cost $800 out of pocket." *See id.*; R. 526–27. Marnie hadn't "been back to have the rest of it done[] because [she] can't afford to do it." R. 44; *see* R. 532. The medial nerve block provided "a little bit of relief" for "a day or two." R. 44; *see* R. 531–32 (June 28, 2023). "That really didn't do much of anything" for her chorionic neck pain. R. 44. Dr. Lanford still

17

gives Marnie Toradol and Depo-Medrol steroids when her pain flares up. R. 45.

After her neck surgery, Marnie "was told not to lift over ten pounds." R. 45. "Of course, that doesn't always happen." *Id.* If she lifts "anything . . . over ten pounds, or 15 pounds, [she] can feel a pull . . . in [her] neck. And then usually [she'll] . . . have more pain, sometimes severe pain." *Id.* She "normally [doesn't] do any lifting. [She] might lift a laundry basket, . . . or something like that. But that doesn't weigh 15 pounds." *Id.* Marnie can stand and walk for "about ten minutes" before her back pain increases. *Id.* She can sit comfortably for "ten minutes or so. [She's] constantly shifting around, and having to stand up if [she has] to wait . . . for a while." *Id.* Marnie spends most of her time at home. *Id.*; *see, e.g.*, R. 273 ("Today is day 5 of not leaving home."). She does not "do a lot of chores," and her husband helps with the ones she can do. *See* R. 47–48. For example, "he will go downstairs and get the laundry, and bring it up, and dump it on the bed, so [she] can fold it up. And then [she will] carry it to the other rooms." *Id.* Marnie can shower and dress herself. R. 48. She usually takes a shower for "five minutes" and "sit[s] down for a few minutes" to rest before getting dressed. *Id.* "[M]ost days are basically the same" from a pain perspective. *See id.* She might "have a day when it's much worse, but [she doesn't] really have good days." *Id.*

C.    *The ALJ's Decision*

ALJ Munday referenced some of the above evidence in her written decision. *See* R. 23 (citing R. 43–45, 48); R. 23–24 (citing R. 314, 318, 323–24, 339–40, 341–42, 345–46, 442, 463, 486–87, 503, 505, 508, 513–14, 522, 527, 532, 567); R. 25–26 (citing R. 60, 70, 406, 425, 468, 488, 559–60). She considered the allegedly disabling symptoms that Marnie attributed to her severe "degenerative disc disease with stenosis and radiculopathy," R. 20, as part of the RFC assessment. *See* R. 23–25. Her summary of "the alleged symptoms," R. 24, references Marnie's

18

hearing testimony

> that she is unable to work because of chronic pain in her neck that radiates into her left arm and low back that radiates into her hips and legs. [She] testified that she takes medicine, has tried physical therapy, exercise, and got injections from pain management. [She] testified that she has received a nerve block that really did not do much. [She] testified that she is not supposed to lift over ten pounds, can stand for ten minutes, and sit for ten minutes with shifting around. [She] testified that she has trouble with focusing and concentrating. [She] testified that he is able to shower and dress herself. [She] testified that she does not really have good days.

R. 23 (citing R. 43–45, 48). It does not mention Marnie's other statements describing her very limited activities of daily living. *See, e.g.*, R. 45, 47–48, 226–29, 273–74.

ALJ Munday then summarized the medical evidence that she found credible, useful, and consistent. *See* R. 24–26. She concluded that Marnie's cervical/lumbar DDD with radiculopathy "could reasonably be expected to cause the alleged symptoms; however [Marnie's] statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence for the reasons explained in [the] decision." R. 24. Her decision contains three specific reasons. R. 24–25.

*First*, Marnie's statements were "inconsistent with the [objective] medical evidence of record. For instance, findings during diagnostic testing have been minimal. Findings during physical examinations have been minimal. While [Marnie] had some positive facet loading, she also had normal gait, 5/5 strength, normal sensation, normal coordination, and normal deep tendon reflexes" on exams in April 2022, March 2023, and May 2023. R. 24–25 (citing R. 339–40, 486, 513–14); *see* 20 C.F.R. § 404.1502(f) ("Objective medical evidence means signs, laboratory findings, or both."). *Second*, Marnie's "impairments have been relatively stable with current treatment. [She] has received epidural steroid injections, a medial branch block, a prescription for a TENS unit by pain management." *Id.* (citing R. 346, 508, 526). Dr. Lanford "prescribed steroids and Vicodin . . . with instructions to use heat/ice and [do] daily exercises at

19

home. [Marnie] has not participated in physical therapy, required surgical intervention, or been hospitalized" for her impairments. R. 25 (citing R. 463). *Third*, Marnie "provided inconsistent statements regarding her limitations. [She] testified that she is not supposed to lift over ten pounds. However, [she] had 5/5 strength during examinations, which is inconsistent with her testimony." *Id.* (citing R. 45, 340, 486, 513).

ALJ Munday also considered the persuasiveness of different medical opinions about Marnie's exertional abilities and limitations. R. 25–26; *see* 20 C.F.R. § 404.1520c. The DDS physicians who reviewed Marnie's records in August 2022 and April 2023, respectively, opined that Marnie "was capable of lifting/carrying 20 pounds occasionally and 10 pounds frequently, standing/walking 6 hours and sitting 6 hours in an 8-hour workday." R. 25 (citing R. 60, 70). ALJ Munday concluded, "[t]hese opinions are persuasive as *they are supported by and consistent with the medical evidence* of record." R. 25 (emphasis added). She did not discuss either source's actual supporting explanation, R. 61, 70, or cite any medical evidence that she found consistent. *See* R. 25. "However," ALJ Munday also concluded that the DDS opinions were not restrictive enough. *Id.* She stated that the September 2023 x-ray showing "mild" and "moderate to severe" degenerative changes in Marnie's cervical and lumbar spine "supports additional limitations including a sit/stand opinion every 30 minutes." R. 25–26 (citing R. 566–68). She did not explain how the objective findings she cited supported this conclusion. *See* R. 25–26.

In March 2023, Dr. Scott opined that Marnie "can lift/carry 5 pounds frequently and 2–5 pounds occasionally [and] stand/walk 4 hours and sit 4 hours in an 8-hour workday. This opinion [was] not persuasive." R. 26 (citing R. 488). ALJ Munday explained,

> Dr. Scott's opined limitations *are not supported by his own findings* of 5/5 strength, normal gait, normal reflexes, and normal sensation. This opinion *is not consistent with the medical evidence* of record including findings of normal gait and coordination, normal sensation, 5/5 strength, and 2+ deep tendon reflexes during

> pain management examinations (Exs. 2F; 7F) which indicate the claimant is capable of lifting/carrying 20 pounds occasionally and 10 pounds frequently, [and] standing/walking 6 hours and sitting 6 hours in an 8-hour workday . . . . An x-ray of the lumbar spine in August 2023 that showed mild disc height loss and facet atrophy without significant interval change (Ex. 10F/10–11) supports limitations including a sit/stand option every 30 minutes . . . .

R. 26 (emphasis added) (citing R. 339–40, 513–14, 570–71). Her analysis does not mention Dr. Scott's supporting explanation that Marnie's lifting/carrying and standing/walking restrictions were "due to degenerative disc disease," R. 488. *See* 20 C.F.R. § 404.1520c(c)(1). Additionally, despite citing to objective evidence of degenerative disc disease that she believed supported a 30-minute sit/stand option, ALJ Munday never mentioned Dr. Scott's medical opinion that Marnie could sit for 30 minutes at one time and stand for 30 minutes at one time, R. 488. *See* R. 26. Dr. Scott expressly attributed the latter restriction "to degenerative disc disease." R. 488.

Finally, ALJ Munday noted Dr. Lanford's opinions from March, April, and June 2022 that Marnie "could never sit, stand, walk, lift, [or] push/pull." R. 26 (citing R. 406, 425, 468). She did not mention his accompanying explanations that Marnie's inability "to sit/stand for periods of time" resulted from chronic "lumbar & cervical pain; radiculopathy; stenosis." R. 405; *accord* R. 425 ("Patient with pain in extremities . . . able to sit or stand for only short periods."); R. 468 ("[S]evere spinal stenosis cervical & lumbar spine . . . pain radiates into extremities"). In December 2023, Dr. Lanford opined that Marnie "could stand/walk less than 2 hours total in an 8-hour workday; sit less than 2 hours in an 8-hour workday; and lift up to 10 pounds." R. 26 (citing R. 559–60). "This opinion [was] not persuasive as *it is not supported by and consistent with the medical evidence* of record." R. 26 (emphasis added). ALJ Munday explained,

> Dr. Lanford is a primary care provider and does not have the level of expertise of other medical providers when assessing [Marnie's] capabilities and limitations. *For instance*, findings during pain management examinations, when [Marnie] had normal gait and coordination, normal strength, normal sensation, and 2+ deep tendon reflexes (Exs. 2F; 7F) indicate [she] would be capable of lifting/carrying 20 pounds occasionally and 10 pounds frequently [and] standing/walking 6 hours and

21

> sitting 6 hours in an 8-hour workday . . . . [Marnie's] reports of 80% pain relief
> following a medial branch block (Ex. 7F/33–34) supports limitations including a
> sit/stand option every 30 minutes . . . .

*Id.* (emphasis added) (citing 339–40, 513–14, 531). ALJ Munday did not identify any "other medical providers" or cite any evidence in Marnie's record suggesting that Dr. Lanford "does not have the level of expertise" to assess his own patient's MDI-related limitations. *See id.* She also did not acknowledge Dr. Lanford's explanation that he "assess[ed] the above limitations based on first-hand knowledge of [his] patient's conditions, experience treating patients with similar conditions, and because they are medically reasonable in relation to the patient's condition," R. 560. *See* 20 C.F.R. § 404.1520c(c)(1). And, as with Dr. Scott's opinion, ALJ Munday did not mention Dr. Lanford's opinion that Marnie could sit for "15–30 minutes" at one time. R. 559. Nonetheless, she found that Marnie's "reports of 80% pain relief" one day after a medial branch block supported "a sit/stand option every 30 minutes." R. 26 (citing R. 531–32). She did not explain that conclusion.

D.     *Analysis*

1.     *Medical Opinions*

Marnie challenges the ALJ's analysis of Dr. Scott's and Dr. Lanford's medical opinions on two grounds. First, she asserts that 20 C.F.R. § 404.1520c involves a two-step analysis where the ALJ "must articulate, first, which medical opinions . . . meet a threshold requirement of being 'persuasive,' by assessing the 'most important factors' of consistency and supportability." Pl.'s Br. 8–9 (quoting 20 C.F.R. § 404.1520c(a)); *accord id.* at 16 ("[T]he analysis described in § 404.1520c is a two step-analysis where opinions are first evaluated for whether they are consistent with and supported by the record."); *id.* at 17–18 (also referencing a "two-step" analysis). Her counseled brief asserts that ALJ Munday's analyses of Dr. Scott's and Dr. Lanford's medical opinions are flawed because she "never performed the second step analysis

22

described in § 404.1520c(b)–(c) when more than one opinion is reasonably consistent with and supported by the record." *Id.* at 17.

Marnie misinterprets the regulation. Section 404.1520c states that ALJs "will consider" a source's medical opinions "using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate," to "evaluate the persuasiveness" of each source's opinions. 20 C.F.R. § 404.1520c(a)–(b); *accord Oakes*, 70 F.4th at 212 ("[W]hen determining the persuasiveness of medical opinions, an ALJ must consider the following factors" listed in § 404.1520c(c)(1)–(5). They also must "articulate . . . how persuasive [they] find all of the medical opinions" using the "articulation requirements" in subsection 404.1520c(b). *Id.* § 404.1520c(b). The ALJ's decision "*will explain* how [it] considered the supportability and consistency factors" because those are "the most important factors [that ALJs] consider when [they] determine how persuasive [they] find a medical source's medical opinions . . . to be." *Id.* § 404.1520c(b)(2) (emphasis added). ALJs "may, but are not required to, explain how [they] considered the factors" in paragraphs (c)(3) through (c)(5), "as appropriate," in evaluating "the persuasiveness" of those opinions. *See id.* They still must "consider" those factors, however. *Id.* § 404.1520c(a); *Oakes,* 70 F.4th at 212.

ALJ Munday was not required to consider the "supportability" and "consistency" factors before considering the other relevant factors in determining that Dr. Scott's and Dr. Lanford's opinions were not "persuasive." 20 C.F.R. § 404.1520c(a). Moreover, the articulation requirements for "equally persuasive medical opinions . . . about the same issue" do not apply here because ALJ Munday *did not find* two or more conflicting medical opinions to be "both equally well supported and consistent with the record," *id.* § 404.1520c(b)(3). *See* R. 25–26. She found that the DDS physicians' medical opinions *were* "supported by and consistent with the medical evidence," whereas Dr. Scott's and Dr. Lanford's more restrictive opinions *were not*

"supported by" or "consistent with" the evidence she cited. *See* R. 25–26. Put differently, ALJ

Munday did not need to "break [a] tie" between conflicting opinions, Pl.'s Br. 9, 16, because she

concluded that the DDS physicians' *identical* RFC assessment for light work was the *only*

medical opinion that was "reasonably consistent with and supported by the record," *id.* at 17. *See*

R. 25–26. Marnie's counseled brief does not explain why § 404.1520c(b)(3) would apply in her

case. *See* Pl.'s Br. 9, 16–17.

Next, Marnie challenges ALJ Munday's reasons for finding Dr. Scott's and Dr. Lanford's

opinions not persuasive. *See* Pl.'s Br. 14–19 (citing R. 26). She asserts that the ALJ substituted

her lay opinion for the physicians' medical judgment and failed to explain why the evidence she

cited was "inconsistent" with their proposed exertional limitations. *See id.* I agree. "Like the

ultimate determination that a claimant has or lacks residual functional capacity, [courts] review

the subsidiary determination that a medical opinion has or lacks supportability and consistency

for substantial evidence." *Drumgold*, 144 F.4th at 606. The ALJ's decision also must build an

accurate and "logical bridge between the evidence and the ALJ's conclusion that [a medical]

opinion," *Oakes*, 70 F.4th at 214, is or is not "persuasive" evidence of the claimant's RFC, *see*

*id*. at 212–13. *See, e.g.*, *Drumgold*, 144 F.4th at 605.

ALJ Munday's decision does not meet this deferential standard. *See Stephen R. v.*

*O'Malley*, No. 21-2292, 2024 WL 3508155, at *4 (4th Cir. July 23, 2024). Her discussion of the

mandatory consistency factor contains too little logical explanation to permit meaningful judicial

review. She also did not "explain how [she] considered" the *actual* "supporting explanations

presented by" each physician to justify his medical opinions, as the regulation required her do.

20 C.F.R. § 404.1520c(b)(1), (c)(1). She also gave "invalid reasons" for rejecting Dr. Lanford's

opinion. *Stephen R.*, 2024 WL 3508155, at *5. Accordingly, ALJ Munday "did not correctly

24

apply 20 C.F.R. § 404.1520c" to either medical opinion, both of "which informed [her] evaluation of [Marnie's] RFC." *Id.* at *4.

ALJ Munday concluded that Dr. Scott's proposed limitations were "not supported by his own findings of 5/5 strength, normal gait, normal reflexes, and normal sensation" and were "not consistent with" other examining physicians' "findings of normal gait and coordination, normal sensation, 5/5 strength, and 2+ deep tendon reflexes." R. 26. As to the consistency factor, she did not explain how the cited findings were "inconsistent with" Dr. Scott's opinions that Marnie was limited to lifting/carrying 5 pounds, sitting four hours total, and standing/walking four hours total during an eight-hour workday, R. 26. *Cf. Oakes*, 70 F.4th at 214 (rejecting ALJ's unexplained conclusion that one examining source's opinion that the claimant should use an ambulatory device "was inconsistent with" two other examiners' findings that the claimant "did not suffer from abnormal gait, diminished range of motion, or neurological deficits" on their exams because "viewing the three examiners' respective gait and mobility conclusions in a vacuum does not evince a logical bridge between the evidence and the ALJ's conclusion that [the ambulatory device] opinion is inconsistent"). Indeed, as Marnie points out, Dr. Scott chose each limitation *knowing* that she exhibited full strength with normal gait, reflexes, and sensation on that day's exam. Pl.'s Br. 14. This suggests that, at least in Dr. Scott's medical judgment, those normal exam findings were not clinically significant indicators of Marnie's abilities to lift/carry, sit, and stand/walk on a regular and continuing basis. *Cf. Howard v. Saul*, 408 F. Supp. 3d 721, 731 (D.S.C. 2019) ("To isolate just one variable out of context and use it as a basis to discredit the conclusion of a medical professional is equivalent to the ALJ 'playing doctor.'" (quoting *Lewis*, 858 F.3d at 869)). "An ALJ may not substitute [her] own lay opinion for a medical expert's when evaluating the significance of clinical findings," *Arakas*, 983 F.3d at 108. ALJ

25

Munday appears to have done that in concluding Dr. Scott's opinions were inconsistent with the cited exam findings.[6]

On supportability, ALJ Munday stated only that Dr. Scott's medical opinion was "not supported by his own [normal] findings" on exam. R. 26. Supportability, however, requires the ALJ to evaluate "the degree to which *a provider supports their opinion with* relevant, objective medical evidence *and explanation*." *Oakes*, 70 F.4th at 212 (emphasis added). "The more relevant the objective medical and supporting explanations presented by a medical source are to support his or her medical opinions . . . , the more persuasive the medical opinions . . . will be." 20 C.F.R. § 404.1520c(c)(1). Dr. Scott explained that his restrictions on Marnie's lifting/carrying and sitting/walking capacities were "due to degenerative disc disease." R. 488. ALJ Munday did not mention this explanation, let alone "explain how [she] considered" the extent to which it made Dr. Scott's opinions more or less persuasive. *See* 20 C.F.R. § 404.1520c(b)(2), (c)(1). This was clear legal error. *Id.* § 404.1520c(a). Moreover, a court "cannot fill in the blanks for the ALJ in the first instance" where, as here, she has not properly considered a mandatory factor. *See Patterson*, 846 F.3d at 662.

ALJ Munday's analysis of Dr. Lanford's medical opinions is also flawed. She did not mention Dr. Lanford's supporting explanation that he assessed the proposed "limitations based on first-hand knowledge of [his] patient's conditions, experience treating patients with similar

---

[6] Further, ALJ Munday did not explain why the August 2023 lumbar x-ray showing "mild disc height loss and facet arthropathy" supported her RFC finding that Marnie needed "a sit/stand option every 30 minutes," R. 26. Dr. Scott opined that Marnie could sit "for 30 minutes at a time" and stand "for 30 minutes at a time . . . due to degenerative disc disease," R. 488. This is consistent with the 30-minute sit/stand option. Yet, ALJ Munday appears to have rejected Dr. Scott's opinion and relied upon her "own interpretation of the raw medical data" to support this limitation. *See Farrar v. Astrue*, No. 3:11cv457, 2012 WL 3113159, at *10–11 (E.D. Va. July 13, 2012), *adopted*, 2012 WL 3113153 (E.D. Va. July 31, 2013). At the very least, this creates an internal inconsistency within ALJ Munday's RFC assessment that frustrates meaningful judicial review. *See, e.g.*, *Stacey A. v. Dudek*, Civ. No. 24-457, 2025 WL 948295, at *4 (D. Md. Mar. 25, 2025).

conditions, and because they are medically reasonable in relation to the patient's condition," R. 560. *See* R. 26. Thus, as with Dr. Scott's medical opinions, the ALJ never properly considered the supportability factor. 20 C.F.R. § 404.1520c(a), (c)(1); *cf. Patterson*, 846 F.3d at 662.

ALJ Munday did "invoke[]" the consistency factor when evaluating Dr. Lanford's opinions, but her "threadbare" analysis lacks the necessary logical explanation. *Stephen R.*, 2024 WL 3508155, at *4; *cf. Thomas*, 916 F.3d at 311 (noting that "the ALJ's logical explanation[] is just as important" as her summary of the evidence and her conclusion). For example, she never referenced the specific "medical evidence" with which she found Dr. Lanford's opinion to be inconsistent, R. 26. *See Stephen R.*, 2024 WL 3508155, at *4. Instead, she went straight to listing the normal exam findings she believed "indicate" Marnie had the RFC to lift/carry 20 pounds occasionally and 10 pounds frequently, stand/walk 6 hours total, and sit 6 hours total in an eight-hour workday, R. 26.[7] *Cf. Thomas*, 916 F.3d at 311 ("[M]eaningful review is frustrated when an ALJ goes straight from listing evidence to stating a conclusion."). Those exam findings are not necessarily inconsistent with Dr. Landlord's medical opinion that Marnie's RFC was much more limited—particularly in light of his explanation that he chose each restriction "based on [his] first-hand knowledge of [Marnie's] conditions . . . and because they are medically reasonable in

---

[7] Marnie argues that ALJ Munday also found Dr. Lanford's opinion "unpersuasive because [Marnie] obtained '80% pain relief following a medial branch block'" on June 27, 2023. Pl.'s Br. 18 (quoting R. 26; citing R. 531–32). That finding is not clear from the ALJ's decision. R. 26. However, ALJ Munday did conclude that Marnie's "reports of 80% pain relief" after this procedure "supports . . . including a sit/stand option every 30 minutes" in the RFC finding. *Id.* She did not explain how she reached this conclusion. Moreover, as Marnie points out, she gave that report on June 28, 2023, only *one day* after undergoing the diagnostic nerve block. Pl.'s Br. 18–19 (citing R. 531–32). That August, Dr. Lanford gave Marnie another Toradol injection for neck and back pain. R. 537; *see* R. 44–45. In February 2024, Marnie testified that the medial nerve block provided "a little bit of relief" for "a day or two," but that it "really didn't do much of anything" for her chronic neck pain. R. 44. *See* Pl.'s Br. 19–20 (citing R. 44). ALJ Munday did not mention this evidence in her decision. *See* R. 23–26. On remand, the ALJ should be careful not to infer substantial long-term pain relief from isolated or fleeting reports of improvement. *Cf. Shelley C. v. Comm'r of Soc. Sec. Admin.*, 61 F.4th 341, 348 (4th Cir. 2023) ("Shelley C. usually spiraled into deepened periods of heightened anxiety and depression mere days after she vocalized her improvement.").

relation to" those conditions, R. 559. *Cf. Oakes*, 70 F.4th at 214 (indicating that claimant's normal gait, range of motion, and neurological signs on two exams were not "inconsistent with" examining source's medical opinion he should use an ambulatory device); *Arakas*, 983 F.3d at 108 ("An ALJ may not substitute his own lay opinion for a medical expert's when evaluating the significance of clinical findings."). Viewing the cited exam findings "in a vacuum does not evince a logical bridge between the evidence and the ALJ's conclusion that Dr. [Lanford's] opinion was inconsistent," *Oakes*, 70 F.4th at 214. In short, ALJ Munday's analysis of the consistency factor "contains too little logical explanation" to permit meaningful judicial review. *Thomas*, 916 F.3d at 312.

ALJ Munday also found Dr. Lanford's medical opinions "not persuasive" because he "is a primary care provider and does not have the level of expertise of other medical providers when assessing [Marnie's] capabilities and limitations." R. 26; *cf.* 20 C.F.R. § 404.1520c(c)(4) ("The medical opinion . . . of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion . . . of a medical source who is not a specialist in the relevant area of specialty.") She did not cite any evidence to support her suggestion that Dr. Lanford lacked "the expertise" to evaluate how Manie's chronic neck and back pain impacted her functioning.[8] *See Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018) ("[T]he ALJ must *both* identify the evidence that supports his conclusion *and* build an accurate and logical bridge from that evidence to his conclusion." (cleaned up)), *superseded by statute on other grounds as*

---

[8] ALJ Munday also did not explain how the objective exam findings she cited allowed her to conclude that Marnie was much less limited than Dr. Lanford said she was. R. 26. As a lay person, ALJ Munday was "simply unqualified to interpret raw medical data in[to] functional terms" that directly contradict an available medical opinion. *Farrar*, 2012 WL 3113159, at *10 (quoting *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999)).

*recognized in Rogers v. Kijakazi*, 62 F.4th 872, 878 (4th Cir. 2023). She also appears to have

ignored countervailing evidence that Dr. Lanford's longstanding relationship with Marnie gave

him "a better understanding" of her impairments than the DDS physicians who "only review[ed]

evidence" in her claim record. 20 C.F.R. § 404.1520c(c)(3)(v) ("A medical source may have a

better understanding of your impairment(s) if he or she examines you than if the medical source

only reviews evidence in your folder."). For example, Dr. Lanford began treating Marnie's neck

and back pain with medications in the summer of 2021, saw her several times during the relevant

period, ordered diagnostic imaging, referred her to pain management for ESI when medication

failed, and understood that her neck and back pain had not responded to increasingly aggressive

treatment. *See, e.g.*, R. 355–60, 366–70, 381–82, 405–07, 412, 417–18, 424–25, 435–36, 443–

45, 460–61, 463, 468–69, 472–73, 542–45. All of this evidence is relevant to factors that ALJs

must consider when they "evaluate the persuasiveness of medical opinions," 20 C.F.R. §

404.1520c(a). *See id.* § 404.1520c(c)(3)(i)–(ii) (instructing that "[t]he length of time a medical

source has treated you" and "[t]he frequency of your visits with the medial source" are factors

that "may help demonstrate whether the medical source has a longitudinal understanding of your

impairment(s)"); *id.* § 404.1520c(c)(3)(iii)–(iv) (instructing that "[t]he purpose for treatment you

received from the medical source" and "[t]he kinds and extent of examinations and testing the

medical source has performed or ordered from specialists" are factors that "may help

demonstrate the level of knowledge the medical source has of your impairment(s)"). ALJ

Munday did not mention any of it. *See* R. 23–26. Accordingly, substantial evidence does not

support her conclusion that Dr. Lanford's opinion is not persuasive. *See Stephen R.*, 2024 WL

3508155, at *4 ("[W]hen the ALJ's decision suggests that he selectively examined the record

and ignored countervailing evidence . . . that decision is not supported by substantial evidence."

(citing *Lewis*, 858 F.3d at 869)); *id.* at *5 (concluding that "the ALJ provided invalid reasons for discounting" medical opinions in part because the reasons were "not supported by substantial evidence").

  2.  *Marnie's Symptoms*

  Marnie also objects that ALJ Munday's RFC assessment "never discussed" specific testimony describing very limited daily activities. Pl.'s Br. 20; *see* 20 C.F.R. § 404.1529(c)(3)(i). ALJs "will consider all of the available evidence" about a claimant's daily activities as one factor in evaluating the extent to which her "symptoms, including pain, will be determined to diminish" her capacity to work. 20 C.F.R. § 404.1529(c)(4). "To be sure, there is no rigid requirement that the ALJ specifically refer to every piece of evidence in her decision." *Thomas*, 916 F.3d at 312 (cleaned up). When the ALJ chooses "not to discuss what appears to be a substantial portion of the record relating to" the claimant's symptoms and alleged limitations, however, "that decision warrants some explanation." *Id.* (mental-treatment records); *cf. Arakas*, 983 F.3d at 99 ("An ALJ may not consider the *type* of a claimant's activities without also considering the *extent* to which she can perform them.").

  Marnie consistently described her daily activities as doing a few basic household chores, with rest breaks, when her persistent severe neck and back pain allows. *See, e.g.*, R. 45–48, 226–27, 229, 273–74, 277, 484. She "mostly stay[s] home," R. 229, because she "need[s] to be able to change positions frequently" or lie down during the day, R. 225–26. *See also* R. 45–48. Marnie argues that these minimal daily activities are entirely consistent with her testimony describing disabling neck and back pain. Pl.'s Br. 20–21; *see Hines*, 453 F.3d at 565–66; *cf. Arakas*, 983 F.3d at 101 ("[D]isability claimants should not be penalized for attempting to lead normal lives in the face of their limitations."). Yet, ALJ Munday did not even mention them. Pl.'s Br. 20. The

Commissioner responds that "the ALJ contrasted any daily activities with the remaining record evidence" as part of the RFC assessment. Def.'s Br. 15. That is not correct. *See* R. 23–25. In fact, ALJ Munday's *entire* discussion of Marnie's daily activities is just one sentence: "The claimant testified that she is able to shower and dress herself." R. 23 (citing R. 48). She did not even mention Marnie's testimony that she showers "five minutes" and then rests "for a few minutes" before getting dressed. R. 48; *see Arakas*, 983 F.3d at 99. ALJ Munday did not explain how being able to shower and dress oneself is inconsistent with the symptoms and limitations Marnie described. She also "chose not to discuss what appears to be a substantial portion of the record," *Thomas*, 916 F.3d at 312, documenting minimal daily activities consistent with Marnie's testimony that her "pain is so continuous and/or so severe that [she] cannot work a full eight hour day," *Hines*, 453 F.3d at 565. *See, e.g.*, *Arakas*, 983 F.3d at 101; *Brown*, 873 F.3d at 269–70. "Right or wrong, that decision warrants some explanation." *Thomas*, 916 F.3d 307.

Finally, Marnie challenges the ALJ's stated reasons for concluding that her testimony was not credible. *See* Pl.'s Br. 19–22. ALJ Munday gave three such reasons. One, Marnie's statements were "inconsistent with the [objective] medical evidence of record." R. 24; *see* 20 C.F.R. § 404.1502(f). "For instance, findings during diagnostic testing . . . . [and] physical examinations have been minimal." *Id.* In support, ALJ Munday cited exam notes showing that, while Marnie "had some positive facet loading, she also had normal gait, 5/5 strength, normal sensation, normal coordination, and normal deep tendon reflexes" in April 2022, March 2023, and May 2023. R. 25 (citing R. 339–40, 486, 513–14).[9] As a general rule, ALJs may consider

---

[9] ALJ Munday did not cite evidence of "minimal" findings on diagnostic testing, R. 24–25, and her earlier summary of the medical record correctly notes that diagnostic images showed some "moderate to severe" abnormalities in Marnie's cervical and lumbar spine. *See, e.g.*, R. 23 ("An MRI of the lumbar spine in March 2022 showed . . . L4-L5 moderate to severe bilateral facet degenerative changes . . . causing severe right lateral recess and neural foraminal stenosis," R. 318); R. 24 ("An x-ray of the cervical . . . spine in September 2023 showed . . . moderate to severe degenerative disc disease and retrolisthesis at C3-C4 and

relevant objective medical evidence as one factor "in making reasonable conclusions about the intensity and persistence of your symptoms and the effect those symptoms, such as pain, may have on your ability to work."[10] 20 C.F.R. § 404.1529(c)(2). "However, [the ALJ] will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work *solely* because the available objective medical evidence does not substantiate your statements." *Id.* (emphasis added).

ALJ Munday did not reject Marnie's testimony solely because "minimal" findings on psychical exams did not substantiate her allegations. R. 24–25. The problem, however, is that neither of the ALJ's other reasons survive substantial evidence review. *See, e.g.*, *Brown*, 873 F.3d at 269 ("[T]he ALJ must build an accurate and logical bridge from the evidence to his conclusion that the claimant's testimony was not credible—which the ALJ wholly failed to do here." (cleaned up)).

ALJ Munday found that Marnie's impairments were "relatively stable with current treatment. [She] has received epidural steroid injections, a medial branch block, a prescription

---

C4-C5," R. 567). This discussion belies her conclusion that findings on diagnostic tests were "minimal." *Cf. Owens v. Comm'r, Soc. Sec. Admin.*, No. SAG-14-3692, 2015 WL 5052688, at *3 (D. Md. Aug. 24, 2015) (substantial evidence did not support ALJ's conclusion that claimant could "perform activities of daily living independently and without much difficulty" where the "ALJ did not cite any evidence in making this point, and her earlier discussions of the claimant's activities of daily living . . . indicated that he had significant limitations").

[10] The Fourth Circuit has held "that ALJs may not rely on objective medical evidence (or the lack thereof)—even as just one of multiple factors—to discount a claimant's subjective complaints regarding symptoms of fibromyalgia or some other disease that does not produce such evidence." *Arakas*, 983 F.3d at 97; *accord Shelley C.*, 61 F.4th at 361 (extending *Arakas*'s reasoning to chronic depression). This exception does not apply to complaints of mechanical pain caused by degenerative disc disease or other orthopedic disorder, however, because those impairments do produce objective evidence of abnormal gait, diminished strength, reduced range of motion, and/or impaired sensation in the arms or legs. *See, e.g.*, *Tonya D. v. Kijakazi*, No. 7:20cv777, 2022 WL 1126623, at *8 (W.D. Va. Feb. 7, 2022); *Pierce v. Kijakazi*, No. 2:20cv53, 2022 WL 495294, at *6 (E.D.N.C. Jan. 14, 2022); *Donta J. v. Saul*, No. 2:20cv131, 2021 WL 2711467, at *4 (E.D. Va. July 1, 2021). Thus, ALJ Munday did not err in considering the objective medical evidence as one factor in her symptoms analysis.

for a TENS unit by pain management." *Id.* (citing R. 346, 508, 526). Dr. Lanford "prescribed steroids and Vicodin . . . with instructions to use heat/ice and [do] daily exercises at home. [Marnie] has not participated in physical therapy, required surgical intervention, or been hospitalized" for her impairments." *Id.* (citing R. 463). ALJ Munday did not explain what she meant by Marnie's "impairments have been *relatively stable* with current treatment" of lumbar ESI, a medial branch block, Vicodin, and home exercises. R. 25 (emphasis added). Presumably, "relatively stable" is meant to imply that Marnie's neck and back pain were not as bad or functionally limiting as she testified they were. *See* R. 23–26. "[A] finding of stability does not indicate that a function or condition is good, but instead merely that its status—whatever it might be—is unchanged from some prior time." *Sanders v. Colvin*, No. 5:13cv790, 2015 WL 736088, at *9 (E.D.N.C. Feb. 20, 2015) (collecting cases). Marnie's spine impairment could "be both 'stable' and disabling at the same time." *Hemminger v. Astrue*, 590 F. Supp. 2d 1073, 1081 (W.D. Wis. 2008). Indeed, Dr. Holland repeatedly assessed Marnie's spinal stenosis with radiculopathy as "stable" even though Marnie reported pain limits her "tolerance for walking, standing, and sitting . . . to about 15 minutes." *See* R. 339–41, 344–46, 505–08, 511–14, 518–21. In June 2022, Dr. Lanford said Marnie should "transition to long term disability," R. 406, because her neck and back pain had not responded to medications or ESI. *See* R. 405–06, 417–18. She was still "unable to sit/stand for periods [and] needs to be able to lay down [or] change positions." R. 417. ALJ Munday did not explain how any of this medical evidence—most of which she did not mention—"fails to substantiate that [Marnie's] limitations are of the degree and intensity alleged," R. 25. *Cf. Lewis*, 858 F.3d at 869 ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts to support a finding of nondisability while ignoring evidence that points to disability finding.").

Finally, ALJ Munday found that Marnie's testimony was not credible because she had "provided inconsistent statements regarding her limitations. The claimant testified that she is not supposed to lift over ten pounds. However, [she] had 5/5 strength during examinations, which is inconsistent with her testimony." *Id.* (citing R. 340, 486, 513). Obviously, providers' objective observations that Marnie had 5/5 strength on exams are not *Marnie's* subjective "statements regarding her limitations," R. 25. *See* 20 C.F.R. § 404.1502(f)–(g), (i). Thus, ALJ Munday did not point to any evidence of Marnie giving "inconsistent statements" about this or any other alleged functional limitation. *See* R. 25–26. Moreover, Dr. Scott opined that Marnie should not lift over five pounds even though she had 5/5 strength on exam. R. 448. That medical opinion is fully consistent with Marnie's testimony. *Cf. Hines*, 453 F.3d at 565 (explaining that the ALJ's conclusion that claimant's testimony was "inconsistent" with other cited evidence "was not supported by substantial evidence because the record, when read as a whole, reveals no inconsistency between the two").

V. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **REVERSE** the Commissioner's final decision, **REMAND** the matter under the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** this case from the Court's active docket.

**<u>Notice to Parties</u>**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

34

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: May 21, 2026

Joel C. Hoppe
United States Magistrate Judge